UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

AHARON MILLER, SHANI MILLER, ADIYA : 
MILLER, PETER STEINHERZ, LAUREL :
STEINHERZ, JOSEPH GINZBERG, TEMIMA :    Case No. 1:19-cv-00001
STEINHERZ, and JOSEPH COHEN , :
    :
       Plaintiffs, :
    :    **COMPLAINT**
   -against- :
    :
NATIONAL WESTMINSTER BANK, PLC, :
    :
       Defendant. :

----------------------------------------------------------------x

Plaintiffs Aharon Miller, Shani Miller, Adiya Miller, Peter Steinherz, Laurel Steinherz,

Joseph Ginzberg, Temima Steinherz, and Joseph Cohen, by their attorneys, allege the following.

## NATURE OF THE ACTION

1.     This action is related to the action pending in this court before the Hon. Dora L.

Irizarry captioned *Weiss, et al. v. National Westminster Bank Plc*, 05-cv-4622. Plaintiffs in the

*Weiss* action seek damages from defendant National Westminster Bank, Plc ("NatWest") as a

result of NatWest's knowing provision of financial services to the foreign terrorist organization

HAMAS that aided and abetted the commission of acts of international terrorism, including the

terror attacks that injured the *Weiss* plaintiffs. All of the claims at issue in this action are

derivative of the terror attacks that are before the court in the *Weiss* action, and all of the

Plaintiffs in this action are family members of existing plaintiffs in *Weiss*. In bringing this action,

Plaintiffs rely upon the *Weiss* court's prior decision that it may exercise specific personal

jurisdiction over NatWest in connection with the attacks at issue as a result of its contacts with

New York and with the United States. *See Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp.

3d 264, 289 (E.D.N.Y. 2016).[1] In addition, in this Complaint Plaintiffs have deliberately adhered to the allegations in the operative Sixth Amended Complaint in *Weiss*, and have not added allegations from the existing summary judgment record in the case or cited to additional evidence gained in discovery. Nor are Plaintiffs asserting any new or different claims than the *Weiss* plaintiffs; rather, Plaintiffs have conformed their claims to the operative claims set forth in the parties' joint pretrial order in *Weiss* (Dkt. No. 391) and in the *Weiss* plaintiffs' opposition to NatWest's motion for summary judgment (Dkt. No. 403).

2.      NatWest is incorporated and headquartered in the United Kingdom. It knowingly provided financial services and collected and transmitted money for the benefit of HAMAS,[2] a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")), and thereby aided and abetted HAMAS and provided it with substantial assistance in the commission of acts of international terrorism, as defined by 18 U.S.C. § 2331.

3.      NatWest also itself committed acts of international terrorism by knowingly providing material support to an FTO (in violation of 18 U.S.C. § 2339B)—conduct that involves violent acts or acts dangerous to human life and that has the objective, apparent intent of influencing a civilian population or government through coercion or intimidation—and those acts were a foreseeable and substantial cause of Plaintiffs' injuries.

---

[1] The court's decision is attached as Exhibit A to the Complaint and is incorporated herein by reference pursuant to Fed. R. Civ. P. 10(c).

[2] HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" also known as the "Islamic Resistance Movement."

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 2333 and 2334, as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs. The Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs.

5.    Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

6.    NatWest is subject to personal jurisdiction in this Court for all of the reasons identified by the *Weiss* court in Exhibit A hereto. Defendant is also subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2339B(d)(1)(D) because it has committed tortious acts within the United States by transferring funds through the United States for the benefit of HAMAS, and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein. NatWest is also subject to personal jurisdiction under CPLR 302 because, among other reasons: (a) it transacts business within New York and contracts to supply services within New York; (b) it committed tortious acts within New York; and (c) it committed tortious acts outside of New York that caused injury within New York and (i) it regularly does and solicits business, engages in other persistent conduct, and derives substantial revenue from services rendered in New York and (ii) it expected or should reasonably have expected its conduct to have consequences within New York and it derives substantial revenue from interstate and international commerce.

## THE PARTIES

### A.    The Plaintiffs

### THE BEN YEHUDA STREET BOMBINGS OF DECEMBER 1, 2001

7.      In the late evening of December 1, 2001, two HAMAS suicide bombers, Nabil Halabiya and Osama Bahar, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing. A large quantity of nails was packed with each of the bombs. Eleven people were killed and 188 people were injured.

8.      Bahar had been recruited by Jamal al-Tawil, the chairman of the Al-Islah Charitable Society since 2000. The Al-Islah Charitable Society was one of HAMAS' key charitable front organizations in the West Bank between 2000 and 2004.

9.      After the two suicide bombings, HAMAS terrorists detonated a car bomb near the site of the first two attacks.

### The Miller Family

10.     Plaintiff Aharon Miller is a citizen of the United States and a resident of the State of Israel. He is the brother of Netanel Miller.

11.     Plaintiff Shani Miller is a citizen of the United States and a resident of the State of Israel. She is the sister of Netanel Miller.

12.     Plaintiff Adiya Miller is a citizen of the United States and a resident of the State of Israel. She is the sister of Netanel Miller.

13.     Netanel Miller, a United States citizen, was with friends enjoying ice cream at the pedestrian mall in Jerusalem on December 1, 2001 when one of the HAMAS suicide bombers detonated his explosives a few feet from him. Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

14.     A bolt from the bomb lodged in the upper part of Netanel's leg. Other bolts hit him in the back, resulting in burns. His hand and knee were also injured.

15.     Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg. After walking approximately 30 feet, Netanel collapsed on the sidewalk. Only then did Netanel become aware of how much he was bleeding from the wounds he had sustained in his leg. His attempts to use pressure to stop the bleeding were unsuccessful.

16.     Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, Arie and Chaya Miller. Netanel spoke to his father, who had been an Army medic. Arie asked Netanel specific questions about his condition and insisted Netanel seek medical help.

17.     Ultimately, Netanel was taken to Shaare Zedek Hospital by ambulance. Since Netanel had lost a great deal of blood, he was given a blood transfusion.

18.     Arie came to the hospital. Chaya arrived an hour or so later after she found someone to stay with her other children at her home.

19.     Netanel was admitted to the hospital and remained there for two days.

20.     Netanel endured the pain in his leg for nearly two years.

21.     The pain in Netanel's leg became so severe that he had to undergo surgery, and the bolt that was still lodged in his leg was finally removed.

22.     As a result of the attack, Netanel has suffered severe physical and mental anguish and extreme emotional distress. As a result of the flashbacks and severe pain, Netanel also underwent treatment by a mental health professional.

23.     As a result of the attack, and the injuries Netanel Miller sustained, Plaintiffs Aharon Miller, Shani Miller, and Adiya Miller have experienced severe mental anguish and extreme emotional pain and suffering.

**The Steinherz Family**

24.     Plaintiff Peter Steinherz is a citizen of the United States, and a resident of the State of New York and this District. He is the father of Jonathan Steinherz.

25.     Plaintiff Laurel Steinherz is a citizen of the United States, and a resident of the State of New York and this District. She is the mother of Jonathan Steinherz.

26.     Plaintiff Joseph Ginzberg is a citizen of the United States and a resident of the State of New York. He is the father of Altea Steinherz.

27.     Plaintiff Temima Steinherz is a citizen of the United States and a resident of the State of Israel. She is the daughter of Altea Steinherz.

28.     Altea Steinherz and Jonathan Steinherz are United States citizens.

29.     On December 1, 2001, Altea Steinherz was nine months pregnant. Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby.

30.     Altea wanted to get home to her daughter who was being babysat at the time, but she knew that bombings in Israel were frequently followed by a second bomb intended to kill or injure people fleeing from the first bomb.

31.     A short time later Altea and Jonathan heard another bomb explode. Believing the bombing was now over, they began to walk home.

32.     While walking in the street, they saw a crazed looking man run past them. Altea thought that he might have been the bomber and insisted that the couple turn around, away from the direction from which the man had come.

33.     As they began to run, Altea fell twice, and she broke her left arm as a result of one of the falls.

34.     She experienced severe pain in her arm after the attack and continued to experience pain for many years afterward.

35.     Altea was afraid that, as a result of her falls, her pregnancy might have terminated. Until her son, Yitzhak, was born 11 days later, Altea and Jonathan feared for the condition of their unborn child.

36.     Altea became less self-confident and more fearful generally. She had sleeping difficulties and underwent psychological counseling.

37.     Jonathan felt tremendous anxiety and stress, had significant difficulty sleeping, and underwent psychological counseling.

38.     As a result of the attack, and the injuries Jonathan Steinherz sustained, Plaintiffs Peter Steinherz and Laurel Steinherz have experienced severe mental anguish and extreme emotional pain and suffering.

39.     As a result of the attack, and the injuries Altea Steinherz sustained, Plaintiff Joseph Ginzberg has experienced severe mental anguish and extreme emotional pain and suffering.

40.     As a result of the attack, and the injuries Altea Steinherz sustained, Plaintiff Temima Steinherz has experienced severe mental anguish and extreme emotional pain and suffering.

## THE SHEFFIELD CLUB BOMBING OF MAY 7, 2002

41.     On the night of May 7, 2002, a HAMAS suicide bomber, Muhammad Muammar, entered the third floor of a building in Rishon Letzion's new industrial area that housed the Sheffield Club (social club) and detonated a bomb.

42.     Fifteen people were killed in the attack including Esther Bablar, a United States citizen, and more than 50 others were injured.

43.     Although Esther had initially survived the attack, she died of her injuries the following morning.

**Joseph Cohen**

44.     Plaintiff Joseph Cohen is a citizen of the United States and a resident of the State of Florida. He is the brother of Esther Bablar.

45.     As a result of the attack, and the death of Esther Bablar, Plaintiff Joseph Cohen has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of his sister's society, companionship, comfort, protection, attention, advice and counsel.

## B.     The Defendant

46.     National Westminster Bank, Plc ("NatWest") is a British financial institution with its principal place of business in London, United Kingdom. It is part of the Royal Bank of Scotland Group.

47.     NatWest conducts business in the United States and in New York, both directly and through its agents. During the time period relevant to this action, NatWest maintained offices in Manhattan and in Stamford, Connecticut. NatWest listed the Stamford location as one of its "principal offices" in annual reports that it issued during the relevant time period.

48.     The court in *Weiss* has found that NatWest is subject to specific personal jurisdiction in this Court as a result of its contacts with New York and with the United States. *See* Exhibit A hereto.

**FACTUAL ALLEGATIONS**

A.      **The Islamic Resistance Movement ("HAMAS")**

        1.      **The Founding of HAMAS**

49.     In December 1987, Sheik Ahmed Yassin formed the Palestinian Islamic Resistance Movement ("HAMAS") as an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

50.     Pursuant to its charter, HAMAS and its operatives plan, assist, and conduct acts of international terrorism in Israel and the Gaza Strip, including the attacks that injured the Plaintiffs.

        2.      **Formal Designations of HAMAS as a Terrorist Organization**

51.     In 1989, the Government of Israel declared HAMAS a terrorist organization and also declared it an "unlawful organization" because of its terrorist acts.  Notice of the designation was placed in an official Government of Israel publication, *the Announcements and Advertisements Gazette*.

52.     Initially, HAMAS specialized in kidnapping and executing people suspected of cooperating with Israel.  It quickly evolved and broadened its operations so that, by the early 1990's, it specialized primarily in murdering civilians in Israel.

53.     For example, on April 6, 1994, a HAMAS suicide bomber blew up a bus in Afula, killing eight (8) people.

54.     On April 13, 1994, a HAMAS suicide bomber blew up a bus in Hadera, killing five (5) people.

55.     On October 19, 1994, a HAMAS suicide bomber blew up a bus in Tel Aviv killing twenty–two (22) people.

56.     On January 23, 1995, President Clinton issued Executive Order 12947.  President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

57.     Executive Order 12947 designated HAMAS a Specially Designated Terrorist ("SDT").  The Executive Order also blocked all property and interests in property held by the terrorist organizations and persons designated in the Order, including HAMAS.

58.     On February 25, 1996, a HAMAS suicide bomber blew up a bus in Jerusalem, killing twenty–six (26) people, three (3) of whom were U.S. citizens, and injuring eighty (80) people, three (3) of whom were U.S. citizens.  HAMAS claimed responsibility for the bombing.

59.     On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and Nationality Act and the AEDPA.  This designation has been renewed every two years since 1997.

60.     After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order 13224, declaring a national emergency with respect to the "grave acts of terrorism…and the continuing and immediate threat of further attacks on United States nationals or the United States." Executive Order 13224 designated HAMAS a Specially

Designated Global Terrorist ("SDGT"). The Executive Order also blocked all property and interests in property held by the SDGTs, including HAMAS.

### 3. HAMAS's Organizational Structure and Fundraising Network

61. HAMAS's terrorist operations depend upon its religious and social activities to recruit, educate and train terrorists and to collect material and aid. Its terrorist operations and social activities operate side-by-side and support each other.

### a. The "Dawa"

62. HAMAS's infrastructure in the Palestinian Authority-controlled territory ("the PACT") is comprised of two interwoven components: its terrorist apparatus and its religious and social infrastructure, which is responsible for recruiting and training terrorists. This patchwork of charitable and social institutions is commonly referred to by HAMAS as the "Dawa."

63. For the purpose of raising funds for its operations, HAMAS has established "charity" committees across the PACT and abroad, including committees in Ramallah, Jenin, and Tulkarem that are controlled by HAMAS agents and that collect and distribute their funds on behalf of HAMAS.[3]

64. At all relevant times, NatWest was generally aware of HAMAS's structure and the connection between HAMAS and its "charity" committees.

65. The charity associations and committees channel funds to pay expenses and assist families of terrorist operatives who are arrested, injured or killed.

---

[3] There are approximately 80 such "charitable" committees in the West Bank and Gaza Strip. Those entities are nominally supervised by the Palestinian Authority's Ministry of Waqf and Religious Affairs.

66.     The charity associations also provide housing subsidies to the families of suicide bombers whose homes are often demolished by the Israeli army after the bomber's identity has been confirmed.

67.     These "charities" and other supposed "charitable" associations not only help raise funds for HAMAS's terrorist operations, but also help it identify and recruit potential terrorists. The network of supposed charities assists recruitment, in part, by funneling money to pay benefits to the families of terrorist operatives who are arrested, injured or killed.

68.     HAMAS, like other foreign terrorist organizations, collects funds under the guise of political or humanitarian activities. This fundraising ultimately supports the kind of terrorist activities that injured the Plaintiffs herein.

### b.  HAMAS's Terrorism Financing

69.     Funds raised by or on behalf of HAMAS for "charitable purposes" are used to finance its terrorist activities. As Congress found when passing the AEDPA: "Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."  Antiterrorism Act of 1996, Pub. L. No. 104-132, § 301(a)(7), 110 Stat. 1247.

70.     HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, which is operated by the Muslim Brotherhood. The Union of Good, in turn, raises funds that are, in part, channeled through an entity known as the Palestine Relief and Development Fund and/or Interpal (hereinafter, "Interpal"), which maintained several accounts with defendant NatWest.

### c. **The Union of Good**

71.     I'Tilafu Al-Khayr, a/k/a the Union of Good, is an umbrella organization established by the Muslim Brotherhood in October 2000, immediately following the outbreak of the violent Palestinian-Israeli confrontation commonly termed the "Second Intifada."

72.     The Union of Good is thus a principal fundraising mechanism for HAMAS.

73.     The Union of Good's primary "charitable" purpose is to provide financial support for HAMAS and its agents in the PACT.

72.     The Union of Good is comprised of more than fifty (50) Islamic charitable foundations worldwide. The U.S. Government has designated several of these foundations, including Interpal and the Al-Aqsa Charitable Foundation, as Specially Designated Global Terrorists ("SDGT").

73.     The U.S. Government designated Interpal an SDGT on August 22, 2003, and designated the Al-Aqsa Charitable Foundation an SDGT on May 29, 2003.

74.     NatWest maintains a U.S. Dollar account for the Union of Good with the account number 140-00-08537933.

75.     The Union of Good uses Interpal as its principal clearing house for funds raised throughout Europe and the Middle East.

76.     For example, plaintiffs discovered that the Union of Good's "101 Days Campaign" maintained its own website at www.101days.org. The campaign solicits funds for HAMAS and directs prospective donors to donate via Interpal's NatWest account numbers 60082295142940 (Sterling) and 60720508524882 (Euros).

77.     **Interpal's own website directly manifests the symbiotic link between the Union of Good and Interpal, soliciting donations for the former, and explicitly stating that:**

Any donation that is made to INTERPAL through this web page is distributed with the knowledge and approval of the other members of the Union for Good directly to the charities in Palestine that are implementing the work creation programs. [sic].[4]

78.     The Union of Good is headed by Dr. Yussuf al-Qaradawi, an extremist Sunni Muslim scholar based in Qatar. NatWest is well aware of al-Qaradawi's connections to terrorism and his connection to Interpal.

79.     To begin with, al-Qaradawi has been on the U.S. Watch List since November 1999 and cannot travel to the United States.

80.     Al-Qaradawi was also a leading shareholder and principal in the Al Taqwa Bank, which was officially designated as an SDGT on November 7, 2001, because of its ties to fundraising and money laundering for al Qaeda and HAMAS.

81.     Nor is al-Qaradawi an obscure or shadowy figure. On the contrary, he has his own weekly television program on *Al Jazeera* and has very publicly issued an Islamic religious edict (*fatwa*) authorizing suicide bombing attacks against Israel.[5]

82.     In fact, on April 14, 2002, al-Qaradawi appeared on *Al Jazeera* extolling "jihad and martyrdom" against Israelis and denouncing the U.S. designation of HAMAS and other terrorist organizations.

83.     Although the Union of Good and other fundraising organizations for HAMAS speak only generally about the Intifada and the families of the 'martyrs,' NatWest has been, and remains, in a unique position to monitor and quantify most of the transactions flowing into the Union of Good and Interpal accounts. NatWest is also in a position to monitor and determine the

---

[4]        http://www.interpal.org/web/101.htm.

[5]        Al-Qaradawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the context of the second Intifada, as cited in HAMAS's official website: http://www.palestine-info.info/arabic/fatawa/alamaliyat/qaradawi.htm.

identities of the entities to which the Union of Good and Interpal transmit the funds they collect via NatWest accounts.

84. Thus, while the 101 days website speaks obliquely of supporting **"the families of the injured and the martyred in particular,"** NatWest, at all relevant times has had direct, first-hand knowledge of the organizations to which this "support" has been transmitted, i.e. dozens of notorious HAMAS front organizations.

85. As recently as October 29, 2005, in an interview with *The Guardian* newspaper, al-Qaradawi discussed suicide bombing in Israel and is quoted as saying:

> The actor who commits this is a martyr because he gave his life for the noble cause of fighting oppression and defending his community. These operations are best seen as the weapon of the weak against the powerful. It is a kind of divine justice when the poor, who don't have weapons, are given a weapon which the fully equipped and armed-to-the-teeth powerful don't have - the powerful are not willing to give their lives for any cause.

86. More importantly, al-Qaradawi's views and activities have been a matter of public record for many years.[6]

87. Through his many public appearances and popular television program, al-Qaradawi has never concealed his views about the moral rectitude of murdering Jews and Israelis.

88. To take just one example, in the September 1999 edition of the *Palestine Times*, in an article entitled "Sheikh Yousuf al-Qaradawi: Hamas and the Islamic Jihad represent the glorious face of the Islamic Umma- Interview" al-Qaradawi blessed "the martyrdom operations in which a given Moslem fighter turns himself or herself into a human bomb that casts terror in the hearts of the enemy ... If we can't carry out acts of Jihad ourselves, we at least should support

---

[6]      Al-Qaradawi was the subject of massive publicity in Great Britain when he was invited to London by its mayor in July 2004, but his prominence long predates that event.

and prop up the Mujahideen financially and morally so that they will be steadfast until God's victory."

89.     NatWest is, and at all relevant times was, aware of al-Qaradawi's views or was deliberately indifferent to them. More importantly, NatWest has specific and detailed knowledge of how al-Qaradawi and his myriad of charitable front organizations channel funds to HAMAS because millions of dollars flow through accounts held at NatWest.

90.     Al-Qaradawi might be considered the "chairman of the board" of HAMAS's global fundraising efforts, but Issam Yusuf, a/k/a Essam Yussef, a/k/a Issam Yusuf Mustafa is the operational head (Vice Chairman and Managing Trustee) of the Union of Good. He is a HAMAS agent and former vice chairman of Interpal, and he manages HAMAS's day-to-day fundraising efforts.

91.     The board of directors of the Union of Good includes three senior HAMAS figures: Sheikh Hamid al-Bitawi, Dr. Essam Salhoub, and Bassam Jarrar.

92.     In 2001, al-Qaradawi publicly described the activities of the Islamic charitable societies sustaining the Intifada against Israel as a "new type of *jihad*, financial *jihad*, through which financial support is guaranteed to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

93.     As of the filing of this Complaint, NatWest collects and transmits funds on behalf of the Union of Good and its largest fundraising arm, Interpal.

### d.  Interpal

94.     Charitable donations to the Union of Good are partially collected and distributed through Interpal.

95.     Interpal was founded in 1981 as the Palestine and Lebanon Relief Fund and was reincorporated as Interpal in November 1994.

96.     On or before January 1, 1996, Interpal opened one or more accounts with defendant NatWest.

97.     The Charity Commission, established by law as a regulator and registrar for charities in England and Wales, froze Interpal's accounts at NatWest in March 1996 based on evidence that it channeled money to HAMAS.

98.     The allegations of links between Interpal and HAMAS were published in numerous British newspapers at the time, including *The Guardian* and *The Times of London*.[7]

99.     A spokesman for the Charity Commission told *The Guardian* that Interpal's bank accounts had been frozen "as a precautionary measure." Following the widely published reports of Interpal's links to HAMAS, NatWest took no action to terminate its relationship with Interpal.[8]

100.     The Charity Commission ultimately unfroze the accounts ostensibly because the British government distinguished (at the time) between the military and social or charitable wings of HAMAS. There was no finding by the Charity Commission concerning Interpal's

---

[7]     Richard Norton-Taylor and Ian Black, *Palestinian Charity Funds Frozen Over 'Hamas Link,'* THE GUARDIAN, Mar. 9, 1996; Richard Norton-Taylor, *News in Brief: Palestinian Group Cleared*, THE GUARDIAN, Mar. 13, 1996; Julian Borger, *Close Trust, Israel Pleads; Britain is being asked to clamp down on Palestinian fundraisers,* Sept. 7, 1997; Stewart Tendler and Christopher Walker, *MI5 study 'charity cash linked to Hamas,'* THE TIMES, Mar. 6, 1996; Stewart Tendler, *Charity's funds are frozen over alleged Hamas link,* THE TIMES, Mar. 9, 1996; Adrian Lee and Michael Evans, *MI5 traces network of Hamas funding,* THE TIMES, Mar. 11, 1996.

[8]     In an interview reported in THE GUARDIAN on August 7, 1997, Mr. Ibrahim Hewitt, Chairman of Interpal, publicly acknowledged that it was possible that some of Interpal's beneficiaries in the Palestinian territories had been established by HAMAS.

relationship with HAMAS per se, nor did Interpal attempt to deny that it was transferring millions of dollars to HAMAS.

101. The Charity Commission's May 30, 1996 report concerning Interpal stated its findings as follows:

> Poverty and need must however be the only criteria when deciding how the charity's funds are distributed and aid must not be given because of a person's support for terrorism. We found no evidence in the charity (Interpal) of any pro-terrorist bias, or indeed bias of any kind.

102. Thus, the Charity Commission finding was that Interpal donated funds [to HAMAS] without any evident intent to support terrorism per se, or as the Commission put it, without "any pro-terrorist bias."

103. U.S. anti-terrorism laws, however, do not distinguish between "biased" and "unbiased" support provided to designated Foreign Terrorist Organizations.

104. As Kenneth R. McKune, Associate Coordinator for Counterterrorism at the U.S. Department of State noted in a sworn declaration on April 21, 1998:

> [T]he Antiterrorism and Effective Death Penalty Act of 1996 prohibits the provision of material support or resources to foreign terrorist groups that have been formally designated, pursuant to statute, as "foreign terrorist organizations" by the Secretary of State. In prohibiting comprehensively the provision of such support and resources, the law does not differentiate between the criminal, terrorist activities of these organizations, and the civil, non-violent activities, if any, in which they might engage. In legislating this particular dimension of the "material support" ban, the Congress found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."

105. NatWest nonetheless provided (and continues to provide) funds for institutions that belong to HAMAS's financial infrastructure in the PACT, including many entities the Government of Israel has declared unlawful and the U.S. Department of Justice has identified as agents of HAMAS.

106.    Following the March 1996 British investigation which first placed NatWest on notice that it was transferring funds to HAMAS, Interpal was declared an "unlawful organization" by the Government of Israel in May 1997 because of its fundraising activities on behalf of HAMAS. Notice of the designation was placed in the official publication, the *Announcements and Advertisements Gazette.*

107.    Despite this designation, NatWest did not cease providing financial services to Interpal.

108.    Interpal was further designated a terrorist organization in January 1998 by the Government of Israel. Notice of the designation was also placed in the *Announcements and Advertisements Gazette.*

**B.      NatWest's Conduct**

**1.      NatWest Transfers to HAMAS Entities**

109.    Despite this designation and the knowledge that it was providing financial services to a Foreign Terrorist Organization, NatWest did not cease providing financial services to Interpal.

110.    NatWest provided **and continues to provide** financial services to HAMAS via various HAMAS-controlled institutions including, but not limited to: the Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, the Ramallah-Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Society in the Gaza Strip, and the Muslim Youth Association of Hebron.[9]

---

[9]      The Jenin Charity Committee and Tulkarem Charity Committee (among others) are specifically identified as HAMAS-controlled organizations by the United States Government in the July 2004 criminal indictment of Holy Land Foundation for Relief and Development in the

111.    The Orphan Care Society of Bethlehem was outlawed by the Government of Israel in February 2002. Most of its chief functionaries, including its director, Dr. Ghassan Harmass, are HAMAS terrorists. The Orphan Care Society pays subsidies to the children of HAMAS "martyrs" and imprisoned HAMAS members.[10]

112.    The 2001 version of Interpal's website stated that Interpal "works closely with" the Orphan Care Society.

113.    On August 16, 2002, NatWest transferred $1,875.65 ($1,906 minus commission) from Interpal to the Orphan Care Society.

114.    On September 17, 2002, NatWest transferred £6,533.00 (£6,547 minus commission; approximately $10, 069.30) from Interpal to the Orphan Care Society.

115.    On November 15, 2002, NatWest transferred £5,693 (£5,707 minus commission; approximately $8, 989.82) from Interpal to the Orphan Care Society.

116.    The Islamic Society of Gaza is an alter-ego of HAMAS. Its directors and employees are members of HAMAS and the entity serves as a principal headquarters of HAMAS in the Gaza Strip. Since at least 1996, NatWest has transferred funds to the Islamic Society of Gaza on Interpal's behalf.

117.    The Al-Islah Charitable Society in Ramallah-Al-Bireh was founded in 1997. The Government of Israel declared the Al-Islah Charitable Society an "unlawful organization" in February 2002. The Al-Islah Charitable Society regularly transfers money for the benefit of the families of HAMAS "martyrs," and subsidizes the renovation of homes that belong to the

---

Northern District of Texas.

[10]    In an interview published on the 101 days website, Dr. Harmass states that Interpal is one of the Orphan Care Society's largest sources of donations: http://www.101days.org/arabic/taqareer/yateem.htm.

families of suicide bombers and were destroyed by Israel. The Al-Islah Charitable Society supports the families of "martyrs," HAMAS prisoners in Israeli jails, and deported HAMAS members.

118.    The Jenin Zakat Committee was declared an "unlawful organization" by the Government of Israel in February, 2002. This "charity" is run by HAMAS terrorists, and it provides aid to HAMAS terrorists, to the families of "martyrs," and Palestinians wounded or imprisoned as a result of violent confrontations with Israel.

119.    The 2001 version of Interpal's website states that Interpal "works closely with" the Jenin Zakat Committee.

120.    On May 2, 2003, NatWest transferred £15,687 (£15,713 minus commission; approximately $25,285.90) from Interpal to the Jenin Zakat Committee.

121.    On July 11, 2003, NatWest transferred £15,330 (approximately $25,064.50) from Interpal to the Jenin Zakat Committee. NatWest charged a commission of £11.

122.    The Tulkarem Charity Committee was founded in 1981. The Government of Israel declared the Tulkarem Charity Committee an "unlawful organization" in February, 2002. The Committee is headed by a HAMAS terrorist.

123.    In 2002 alone, NatWest transferred over $1,500,000.00 to the HAMAS front organizations listed in paragraph 352, which had been previously designated as unlawful organizations by the Government of Israel because of their affiliation with HAMAS.

## 2.    Funds Collected by NatWest from Specially Designated Global Terrorists and Convicted Fundraisers for HAMAS

124.    On at least three separate occasions NatWest accepted deposits on behalf of Interpal from organizations and entities whose terrorist connections are a matter of public record.

125.    In April 2000, NatWest accepted a deposit of $66,000.00 for Interpal from the

Holy Land Foundation for Relief and Development ("HLF").[11]

126.    According to a prior version of Interpal's website (dating back to August 2001), Interpal directs persons wishing to make "international donations" to donate to HLF.

127.    On December 4, 2001, the U.S. Secretary of Treasury determined that HLF was subject to Executive Order Nos. 12947 and 13224 because HLF "acts for or on behalf of" HAMAS.

128.    Accordingly, HLF was designated an SDT under Executive Order No. 12947 and an SDGT under Executive Order No. 13224.

129.    In December 2001, the Counsel of the European Union designated Holy Land Foundation as a terrorist entity under Article 2(b) and Regulation (EC) No. 2580/2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism and repealing Decision 2005/848/EC.

130.    In order to facilitate the application of financial sanctions, the European Banking Federation, the European Savings Banks Group, the European Association of Co-operative Banks and the European Association of Public Banks (the "EU Credit Sector Federations") and the Commission recognized the need for an EU consolidated list of persons, groups and entities subject to CFSP related financial sanctions. It was therefore agreed that the Credit Sector Federations would set up a database containing the consolidated list for the Commission, which would host and maintain the database and keep it up-to-date. This database was developed first

---

[11]    On May 6, 1997, the Government of Israel designated the Holy Land Foundation for Relief and Development ("HLF") as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks ..."

and foremost to assist the members of the EU Credit Sector Federations in their compliance with financial sanctions. HAMAS and HLF were so listed in December 2001.

131.    On March 11, 2002, HLF filed suit seeking to enjoin the U.S. Government from continuing to block or freeze its assets.

132.    On August 8, 2002, the United States District Court for the District of Columbia issued a written opinion in *Holy Land Foundation for Relief and Development v. Ashcroft*, 219 F. Supp. 2d 57, 70 (D.D.C. 2002) finding that "between 1992 and 1999, HLF contributed approximately 1.4 million dollars to eight Hamas-controlled "zakat" (or charity) committees.... HLF grant lists also establish that, between 1992 and 2001, HLF gave approximately five million dollars to seven other Hamas-controlled charitable organizations, including a hospital in Gaza."[12]

133.    The publicly available 2002 court decision sets forth with specificity the legal basis for concluding that HLF's conduct – which is nearly identical to that of Interpal – constituted support for terrorism.

134.    Like HLF, the Al-Aqsa Charitable Foundation is a critical part of HAMAS's transnational terrorist support infrastructure. The Al-Aqsa Foundation also maintained branch offices in The Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere.

135.    On March 27, 2003, NatWest deposited at least two payments to Interpal totaling 295,000 Euros from the Dutch branch of the Al-Aqsa Foundation.[13]

---

[12]    In fact, in November 2001, the FBI identified eight (8) charitable fronts as agents of HAMAS, at least 6 of whom have been NatWest wire transfer recipients. See, Memorandum of Dale L. Watson, the Assistant Director of the FBI's Counterterrorism Division, written to R. Richard Newcomb, Director of the United States Treasury Department's Office of Foreign Assets Control ("OFAC") and dated November 5, 2001.

[13]    On July 31, 2002, German authorities closed the Al-Aqsa Foundation in Germany

136.     Two months later, on May 29, 2003, the U.S. Treasury Department added the Al-Aqsa Foundation to its list of Specially Designated Global Terrorist entities, accusing the organization of funneling funds -- including money donated for charitable purposes -- to the militant terrorist group HAMAS.

137.     Nonetheless, NatWest took no steps to close its Interpal accounts.

138.     Years earlier, in or about January 2001, NatWest accepted deposits totaling $70,000.00 on behalf of Interpal from the Al-Aqsa organization in Yemen.

139.     On January 10, 2003, German authorities arrested Sheik Mohammed Ali Hasan al-Moayad, the head of the Al-Aqsa organization in Yemen, at the request of the U.S. Department of Justice and the Federal Bureau of Investigation. The arrest took place after a year-long investigations of al-Moayad and undercover operations by the FBI's Joint Terrorism Task Force for his knowingly and intentionally conspiring to provide material support and resources for Al-Qaeda and HAMAS.

140.     Prior to his arrest in Germany, Sheik al-Moayad had met with an undercover government informant and proffered proof of his prior fundraising on behalf of HAMAS by tendering to the undercover government informant a receipt from Interpal confirming a $70,000.00 donation from the Sheik's Al-Aqsa organization in Yemen.

141.     Sheik al-Moayad was subsequently convicted of providing material support to HAMAS in violation of 18 U.S.C. § 2339B and in 2005 was sentenced to 75 years in prison.

---

because of its support for HAMAS. On January 1, 2003, the Danish government charged three Al-Aqsa Foundation officials in Denmark with supporting terrorism. In April 2003, Dutch authorities blocked Al-Aqsa Foundation assets in The Netherlands based on information that funds were provided to organizations supporting terrorism in the Middle East.

### 3. Interpal's Designation by the U.S. Government in 2003 and Defendant's Continuing Conduct

142.    The August 19, 2003 HAMAS suicide bombing of a bus resulted in the death of Tehilla Nathansen, and injuries to members of the Nathansen family and plaintiff Tzvi Weiss.

143.    Following this atrocity, President George W. Bush stated:

At my direction, the Treasury Department has moved today to block and freeze the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS. By claiming responsibility for the despicable act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people.

144.    Thereafter, Interpal, as one of the five non-governmental organizations, was designated as an SDGT on August 22, 2003.

145.    In an interview reported in *The Guardian* on August 28, 2003, <u>after</u> the U.S. Government designation, Mr. Hewitt, Chairman of Interpal, was publicly quoted as saying: "We deal with people whether they are HAMAS or whether they are Fatah."

146.    Even after Interpal's designation as a Specially Designated Global Terrorist organization and its Chairman's public admission of its relationship to HAMAS, already designated a Foreign Terrorist Organization, NatWest again took no action to cease its relationships with Interpal.

147.    On September 12, 2003, the European Union designated all of HAMAS (including its social "wing") a terrorist organization, but even then, NatWest took no action to close Interpal's accounts.

148.    To this day, notwithstanding all of this publicly available information, NatWest continues to collect and transmit funds for HAMAS.

### 4. Specific Accounts and Transactions

149. Interpal is a pivotal part of HAMAS's fundraising infrastructure and a significant source of HAMAS's financing.

150. For more than nine (9) years, defendant NatWest has knowingly maintained numerous accounts for Interpal and has collected, received, transmitted, and provided **millions of dollars** on behalf of Interpal directly to agents of HAMAS in the PACT.

151. These accounts include:

> U.S. Dollar Account Number – 140-00-04156838
>
> Euro Account Number – 60720508524882
>
> Sterling Account Number – 60082295142940

152. NatWest thereby provides HAMAS with a highly convenient method to collect and transfer funds in U.S. Dollars as well as Sterling and Euros.

153. NatWest also provides Interpal with merchant banking services, directly and through another Royal Bank of Scotland subsidiary, thereby making it possible for Interpal to maintain merchant accounts with MasterCard, VISA and other credit card companies.

154. This allows HAMAS to solicit contributions in dozens of currencies from around the world and allows Interpal to solicit funds for HAMAS via its website at www.interpal.org.

155. In addition, NatWest, with the help of financial products provided by its sister company, provides further substantial assistance to HAMAS by making it possible for British nationals to make direct contributions to Interpal by way of their employer's payroll department through a program called "Give As You Earn."

156.     Since March 1996, defendant NatWest has known that it has been providing financial services to HAMAS and that Interpal collects money for, and transmits money to, HAMAS, a Foreign Terrorist Organization.

157.     NatWest has transferred funds directly to HAMAS-controlled entities on hundreds (if not thousands) of occasions.

158.     For example, on February 19, 2003, NatWest transferred £21,424 (approximately $34,083.40) to the HAMAS front organization, the Tulkarem Zakat (Charity) Committee Society and charged a commission of £10. See Exhibit B attached. At the time NatWest transferred this amount to HAMAS, both Interpal (the repository of the funds) and the Tulkarem Charitable Society (the HAMAS front that received the funds) had been designated as unlawful organizations by the Government of Israel due to their support for or control by HAMAS.

159.     The U.S. Department of Justice has identified the Tulkarem Charitable Society as an "organization, which operated on behalf of, or under the control of, HAMAS."

160.     On April 1, 2003, NatWest transferred another £17,974 (£18,000 minus commission; approximately $28,465.4) from Interpal to the Tulkarem Zakat Committee.

161.     Likewise, on July 30, 2003, NatWest transferred £73,757 ($119,809.00 U.S.) to the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940. See Exhibit C attached. This transaction was apparently financed by the World Assembly of Muslim Youth ("WAMY"), the well known Saudi "charity" linked to both HAMAS and Al Qaeda financing.[14] At the time NatWest transferred this amount to HAMAS, WAMY (the source of the funds), Interpal (the repository of the funds) and the Jenin Charitable Society (the HAMAS front that

---

[14]     The WAMY Conference in Riyadh in October 2002 was attended by the head of the HAMAS Political Bureau, Khalid Mishal, who was also designated a Specially Designated Global Terrorist on August 22, 2003, pursuant to Executive Order No. 13224.

received the funds) had all been designated as unlawful organizations by the Government of Israel due to their support for or control by HAMAS.

162. One of Interpal's officers/directors, Mahfuzh Safiee is an officer of WAMY, Ltd. (a European branch of WAMY).

163. The U.S. Department of Justice has identified the Jenin Charitable Society as an "organization, which operated on behalf of, or under the control of, HAMAS."

164. Nor did NatWest cease providing enormous sums of money to HAMAS even after Interpal was formally designated a Specially Designated Global Terrorist by President Bush on August 22, 2003. On the contrary, the same millions of dollars that NatWest transferred to HAMAS since 1996 and that helped maim and murder U.S. citizens such as the plaintiffs and bankroll the families of terrorists, including suicide bombers, continued to flow unabated even after the U.S. Government designation of Interpal.

165. For example, on November 5, 2003 (two months **AFTER** the official U.S. designation), NatWest transferred £32,329 ($54,322.40 U.S.) to the same well-known HAMAS front organization, the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940. See Exhibit D attached.

166. Transactional documents of the kind attached to this complaint are *themselves* the criminal transactions that Congress tried to interdict by enacting both the criminal provisions of 18 U.S.C. §§ 2339B and 2339C and the civil provision of 18 U.S.C. § 2333(a) as set forth below.

## 5. NatWest's Regulatory Obligations and Duty of Care

167. All banks which have international operations or relationships with correspondent banks have a duty, based on international banking norms, to adopt know your customer ("KYC"), anti-money laundering ("ATL"), and anti-terrorist financing ("ATF")

standards which are defined and enforced by the Financial Action Task Force ("FATF") and its supportive governments.

168.     The United Kingdom is a participant in the FATF.

169.     This duty devolves upon officials and directors of all such banks and includes a due diligence obligation to monitor publicly accessible information and allegations in relation to "high risk" customers, which would include charities collecting funds from the public.

170.     This duty to monitor and profile charity customers arises independently of any particular transaction.

171.     Beginning with the creation of FATF in 1989 and especially since the collapse of the Bank of Credit and Commerce International and the enactment of the first European Union directive on the subject in 1991, a consensus has evolved in the banking community concerning know your customer and anti-terrorist financing standards required by international banking institutions.

172.     These standards are encapsulated in written principles issued by FATF and the Basel Group of Bank Supervisors.

173.     In April 2002, the FATF issued a report entitled "Guidance For Financial Institutions in Detecting Terrorist Financing." The report was issued to all major international financial institutions to provide guidance to "ensure that financial institutions do not unwittingly hide or move terrorist funds. Financial institutions will thus be better able to protect themselves from being used as a conduit for such activity ..."

174.     In addition to its inherent obligation not to violate the criminal statutes of the United States, the FATF report very clearly put NatWest on notice that:

> Regardless of whether the funds in a transaction are related to terrorists for the purposes of national criminal legislation, business relationships with such individuals or other closely

associated persons or entities could, under certain circumstances, expose a financial institution to significant reputational, operational, and legal risk. This risk is even more serious if the person or entity involved is later shown to have benefited from the lack of effective monitoring or willful blindness of a particular institution and thus was to carry out terrorist acts.

175. There are also standards developed by the Wolfsberg Group of banks that affect the correspondent banks of Wolfsberg Group member financial institutions.

176. On July 16, 2002, the Royal Bank of Scotland Group (NatWest's parent company) adopted new "Know Your Customer" guidelines and adopted the so-called Wolfsberg Principles for the Suppression of Terror Financing thereby committing NatWest to implement: "procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list."

177. At the same time, NatWest's parent company publicly acknowledged that: "Funds used to support terrorism do not derive exclusively from criminal activities and differ from those associated with most existing money laundering offences" and committed itself to "the ongoing monitoring of individual transactions on customer accounts ..."

178. In September 2002, the RBS Group of which NatWest issued a "Statement of Principles for Fighting Crime and the Financing of Terrorism." The document describes their plan to institute AML controls, particularly on terrorist financing, and to cooperate with U.K. authorities in criminal investigations.

179. These standards are binding on banks and bankers doing business internationally, due to their commercial relationships with the banks of other countries that are legally obligated to apply these norms.

180.    Accordingly, NatWest had (and has) and affirmative duty to monitor publicly available information and allegations about its customer, Interpal.

181.    NatWest also had (and has) an affirmative duty to monitor publicly available information and allegations about its customer's parent organization – the Union of Good – as well as publicly available information concerning HAMAS controlled entities to which its customer transferred millions of dollars.

182.    It was and remains the standard in the international banking industry for compliance departments at banks like NatWest to access, in detail, public allegations of misconduct by such "charities" or diversions of their funds to terrorist activities.

183.    In many cases, information linking payees of NatWest transactions and HAMAS could readily be obtained by simple Internet searches or by subscribing to a database or press clippings service.

## CLAIMS FOR RELIEF

184.    Plaintiffs' claims for relief herein conform to the operative claims for relief in *Weiss*, as set forth in the parties' joint pretrial order (Dkt. No. 391) and in the *Weiss* plaintiffs' opposition to NatWest's motion for summary judgment (Dkt. No. 403). Plaintiffs assert claims for relief predicated on primary liability for Defendant's violation of 18 U.S.C. § 2339B and Defendant's aiding and abetting of HAMAS under 18 U.S.C. § 2333(d).

## FIRST CLAIM FOR RELIEF

## COMMITING ACTS OF INTERNATIONAL TERRORISM
## IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C § 2333(a)

185.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

186.     Plaintiffs are nationals of the United States and/or their relatives, survivors, or heirs.

187.     By knowingly collecting and transferring funds for the benefit of HAMAS, the defendant has provided material support to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

188.     As stated above, the Union of Good and Interpal are major funding sources for HAMAS, facts which NatWest knew or to which it was deliberately indifferent.

189.     At all relevant times, Defendant knew of HAMAS's terrorist activities.

190.     Defendant also knew that HAMAS had been designated an FTO by the United States Government.

191.     HAMAS foreseeably used money it receives from fundraising organs like the Union of Good and Interpal to support its infrastructure and operations which included targeting Israelis (and Americans in Israel) in terrorist attacks.

192.     By knowingly, or with deliberate indifference, providing financial services to HAMAS, a designated FTO, NatWest performed non-routine banking services and functions.

193.     By knowingly, or with deliberate indifference, providing millions of dollars and other financial services to an FTO, NatWest's conduct involved violent acts or acts dangerous to human life.

194.     By knowingly, or with deliberate indifference, providing millions of dollars and other financial services to an FTO, NatWest's conduct objectively appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States and/or to influence the policy of the governments of Israel and the United States by intimidation or coercion.

195.     NatWest's conduct violated U.S. criminal law (namely, 18 U.S.C. § 2339B) and occurred primarily outside the United States.

196.     NatWest's conduct was a substantial factor and foreseeable, proximate cause of Plaintiffs' injuries.

197.     By knowingly providing material support to a designated Foreign Terrorist Organization, NatWest is civilly liable for damages to Plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

**SECOND CLAIM FOR RELIEF**

**AIDING AND ABETTING A FOREIGN TERRORIST
ORGANIZATION, HAMAS, IN VIOLATION OF 18 U.S.C. § 2333(d)**

198.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

199.     Plaintiffs were all injured by HAMAS terrorist attacks, all of which were acts of international terrorism as defined by 18 U.S.C. § 2331.

200.     Plaintiffs are nationals of the United States and/or their relatives, survivors, or heirs.

201.     At all relevant times, HAMAS was a designated FTO.

202.     HAMAS committed, planned, and authorized each of the terrorist attacks that injured Plaintiffs.

203.     NatWest aided and abetted HAMAS by knowingly providing substantial assistance to HAMAS.

204.     NatWest provided substantial assistance to HAMAS by transferring significant sums of money to HAMAS institutions and maintaining bank accounts for the Union of Good and Interpal, knowing that HAMAS was a designated FTO and knowing that it engaged in

terrorism all while knowing or being deliberately indifferent to the fact that HAMAS was a designated FTO and knowing or being deliberately indifferent to the fact that HAMAS engaged in terrorism.

205. NatWest's acts were a substantial factor in causing Plaintiffs' injuries, and Plaintiffs' injuries were a foreseeable result of the significant sums of money NatWest provided to HAMAS.

206. NatWest was generally aware of its role in HAMAS's terrorist activities and the role Interpal played in financially supporting HAMAS, including Interpal's and the Union of Good's solicitation of funds for HAMAS, at the time it provided this assistance.

207. Plaintiffs allege that NatWest aided and abetted HAMAS within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *See* Justice Against Sponsors of Terrorism Act ("JASTA"), § 2(b).

208. NatWest knew or was deliberately indifferent to the fact that it was transferring millions of dollars to HAMAS on behalf of its clients, the Union of Good and Interpal and yet continued to provide that assistance.

209. At all relevant times, NatWest knew of HAMAS's terrorist activities and that HAMAS was designated an FTO by the Government of the United States.

210. Despite this knowledge, NatWest continued to provide financial services to HAMAS for years.

211. NatWest is therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Accept jurisdiction over this action;

(b) Enter judgment against the Defendant and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial;

(c) Enter judgment against the Defendant and in favor of each Plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

(d) Enter judgment against the Defendant and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(e) Enter an order declaring that the Defendant has violated, and is continuing to violate, the Antiterrorism Act, 18 U.S.C. § 2331 *et seq*. ; and

(e) Grant such other and further relief as justice requires.

## JURY DEMAND

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: January 1, 2019
      Hackensack, New Jersey

OSEN LLC
Gary M. Osen, Esq.
Ari Ungar, Esq.
Peter Raven-Hansen, Esq., Of Counsel
Aaron Schlanger, Esq.
2 University Plaza, Suite 402
Hackensack, New Jersey 07601
(201) 265-6400

ZUCKERMAN SPAEDER LLP

By :   <u>/s/ Shawn P. Naunton</u>
Shawn P. Naunton, Esq.
485 Madison Avenue, 10th Floor
New York, NY 10022
(646) 746-8655

TURNER & ASSOCIATES, P.A.
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard, Esq.
Stephen H. Schwartz, Esq.
Neil L. Glazer, Esq.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700

*Attorneys for Plaintiffs*